CROZIER-STRAUB, Inc., et al. v. GRAHAM et al. SAME v. MELMOD. SAME v. DOWNER.

District Court, D. New Jersey.　October 28, 1927.

Nos. 1520, 2025.

Patents ⬡⟶328—Straub, 1,212,840, for cinder building block, held invalid and also not infringed.

Straub patent, No. 1,212,840, for building block composed of a mixture of coarse and fine coal cinders and ashes, ground together, cement, and water, *held* invalid for lack of invention in view of the disclosures of the prior art, but, if conceded validity, limited to the precise disclosure, and as so limited not infringed.

In Equity.　Suits by Crozier-Straub, Inc., against Thomas Graham and the Atlantic City Building Block Corporation, against Jacob Melmod, and against Robert G. Downer.　Decrees for defendants.

Cooper, Kerr & Dunham, of New York City, Charles M. Clarke, of Pittsburgh, Pa., and John C. Kerr and Thomas J. Byrne, both of New York City, for plaintiffs.

Charles W. Letzgus, of Camden, N. J., for defendant Downer.

Walter Biddle Saul, Allen S. Olmsted, 2d, and Joseph G. Denny, Jr., all of Philadelphia, Pa., for other defendants.

BODINE, District Judge.　These three suits were tried together.　They are actions brought on the equity side of the court for infringement of the Straub patent, No. 1,212,840, granted January 16, 1917, held valid.　Straub v. Campbell (C. C. A.) 259 F. 570.　The record here is quite different from the record below in that case.

The case of Straub v. Campbell was tried before Judge Orr.　He held the patent invalid, but the Circuit Court of Appeals reversed the decree of the District Court. Counsel for defendant, for some reason, did not offer in evidence the Patent Office file wrapper, the prior art patents, or the testimony of an expert.　Different counsel appeared before me, and the record is entirely new and distinct.

The decision of the Circuit Court of Appeals defines the scope of the invention in the manufacture of cinder blocks from crushed cinders, cement, and water, the run of the grate being used, and held that the block itself had a novel feature, in that boards could be readily nailed upon it without splitting or cracking the block.　The Circuit Court of Appeals said (259 F. 571):

"The gist of his invention, for such we think it is, was in taking ordinary furnace ashes and using the whole of that product, without sifting or selection."　Straub "found that, by taking the whole of the ashes—clinkers, fine dust, and all—and grinding the entire product and mixing it with cement and water, he was able to produce a new and useful article in the building art."

And on page 573:

"While the use of cinders in groutings, in foundations, in walks, roads, and other structures, was old, and while even screened ashes had been used in building blocks, no one before Straub conceived the novel idea of taking the whole ash product—clinkers and ash alike, half burned and wholly burned, lumps and dust—in fact, the entire run of the grate, and using the whole waste product in its raw state, rolling or grinding the whole mass. So novel was this joint use of the whole ash mass, in connection with cement and water, that the Patent Office granted to Straub the broad claim of: 'A building block composed of a mixture of coarse and fine coal cinders and ashes, retaining all the original mass, cement, and water.' * * * The product Straub gave in his building block is new in make-up and new in function, in that while, like the old block, it is proof against sound, water, fire, and electric current, Straub's has the wholly new feature of allowing a nail to be driven in it without breaking, and firmly holding the nail in place. It is light of weight, and cheaper than former blocks. It can be broken on nearly straight lines, and he offered to prove, and could presumably have done so, had the testimony been admitted, that the relative tensile strength of his cinder block to concrete block was as 846 to 691."

Straub took the whole of the ashes—clinkers, fine dust, and all, "the run of the grate"—ground them and mixed them with cement and water, making an article said to be new in make-up and new in function, in that a nail could be driven in without breaking.　Straub has enjoyed a discreetly complete monopoly in the Third circuit, and many blocks have been made upon which royalties have been paid.

Straub himself testified (case, pp. 82 to 85) that he does not take the run of any grate; that he selects his ashes; that all ashes will not make a good block, and it is only certain ashes which will make a good block.　How he knows what ashes will make a good block he does not state.　Nor is he able to tell the relative portions of large and small particles used by him in making a suc-

cessful block (case, p. 98). There was nothing new in securing the nailability feature adverted to by the Circuit Court of Appeals. The plaintiffs' expert, Dr. Conwell, so testified (case, p. 470).

Dr. Conwell (case, p. 471 et seq.) testified that the prior art knew the combination of cement, sand, and cinders. It also knew the different strengths and different qualities that were produced by differences in the mixtures. He states that the novelty lies in the substitution of cinder fine aggregate for the sand fine aggregate. The cinder fine aggregate introduced properties that the sand fine aggregate did not have, and tended to destroy; but he also stated that the prior art taught the use of the fine cinder aggregate, as well as the use of the coarser cinder aggregate, as an expedient towards cheapness—not to obtain any special desirable properties.

Straub obtained desirable properties by substituting for the sand fine cinder aggregate, and in combining cement and water with his crushed aggregate of ashes and cinders from selected grates. The novelty was in taking the whole of the cinder aggregate, coarse and fine, not for economy, but for the desirable qualities obtained.

In an issue of Engineering and Cement Work of April 1, 1918, Straub, the patentee, propounded the following question to the editor:

"Where are the cinder concrete blocks made commercially? What proportions should be used? Will they stand fire test, and is the crushing strength fairly high? F. J. S., New Kensington, Pa."

To this question he received the following answer:

"We know of no manufacturer of cinder concrete blocks, and see very little reason for their use. They might stand fire a little better than ordinary concrete blocks, if the cinders were well selected and screened, and all unburned coal removed, but in any case the crushing strength would be lower than with a well-made concrete block."

Such printed matter should not create a monopoly in a building material. The learned editor was not sworn. No opportunity existed to examine him, and from the fact that he answers questions propounded to him no inference arises as to his capacity or special knowledge. He does say that screening is necessary, and that the crushing strength is lower. Straub does not screen the cinders. The prior art did not. The crushing strength is greater, and not less. Because the editor had not heard of cinder con-

crete blocks does not mean that there were none. The question editor of a newspaper might quite readily state the law to be other than the highest courts determine it to be. In fact, federal and state courts are not always in accord as to what the common law is in any given jurisdiction.

The voluminous prior art literature before me, but not before the Circuit Court of Appeals, will be referred to at some length.

The Popp and Melchior patent, No. 344,-594 of 1886, is for a building block. The ingredients set forth in the specifications (page 1, line 20 et seq.) are as follows:

"Ground cinders and ashes, one and one-half bushel; dry slaked lime, twelve pounds; boiled glue, one pound; beach sand, two quarts; plaster of paris, one quart; Portland cement, two quarts."

There was no separation of the cinder mass stated. The blocks were desirable for inside partitions. The specifications (page 1, line 65) say:

"Over such a partition a white coat may be laid directly, without the use of a first coat, and will dry in a very short time. *Into such a partition a nail may be readily driven,* and the partition will not crack or break out, as when nails are driven into plastering."

Note that nails may be readily driven, and the partition will not crack or break. The patent claims (page 2, line 20 et seq.) as follows:

"1. A building block comprising, in combination, cinders, lime, and glue, substantially as set forth.

"2. The improved building block herein described, consisting of cinders, lime, glue, sand, plaster of paris, and cement, in about the proportions stated."

Note that claim 1 is for an *all-cinder block.* Further notice specifications (page 1, line 25) call for grinding or crushing the cinders and ashes. Nothing suggests separation of the coarse cinder aggregate from the fine cinder aggregate.

The Heim patent, No. 89,311, of April 27, 1869, is for a building block. The formula is as follows: Cement or stone lime and water lime, 1 part; coal ashes and coal dust in equal quantities, 4 to 8 parts; 2 pounds of potash to each bushel of cement used. (Note.—The Portland cement industry has largely developed since 1869.)

The patentee states that the blocks made from the above formula are hard and impervious. The Straub blocks are hard, but cellular, rather than impervious (Conwell, case, p. 418). It is not clear why Heim

would not secure the cellular characteristic of Straub, if the particles of coal ashes were sufficiently large.

The Dreyer patent, No. 217,205, June 4, 1879, is for a building block. The formula is as follows: Portland cement, 1 part; coal ashes, 3 parts; mineral wool, 1 part. (Note. —There is no suggestion in this patent that the coal ashes are separated in any way.)

Dr. Conwell states (case, p. 414) that the ashes of 1879 are not the cinders of the last dozen years. This is obviously so. But it seems doubtful that Straub should have a monopoly because the residue of combustion in modern furnaces mixed with cement is better than the residue of combustion of less efficient furnaces mixed with cement.

The Shinn patent, No. 280,679, of July 3, 1883, is for a mixture of four parts coal ashes or cinders and one part cement. The patentee says (page 1, line 76) : "I am aware that a mixture of coal ashes with lime (or cement) is not broadly new, but hitherto the proportion of ashes proposed has been comparatively small." At page 1, line 73, the patentee says that his material can be used for forming building blocks. The expert limits the disclosure of the patent to a kind of mortar. But it would seem that four parts cinders and one part cement was not so very far from Straub's invention when formed into a block. True, Shinn's block was steamtreated; but how can it help Straub to omit this part of the process?

The Ransome patent, No. 322,559, of June 21, 1885, was for a building block made of purified ashes and lime. Cinders were also used, but the blocks were pressed, and not poured.

The Lorenz patent, No. 366,012, of July 5, 1887, is for an artificial building stone composed of five parts ashes, four parts cinders, and one part cement. The patentee says (page 1, line 13 et seq.) :

"A material has been used for these purposes composed of clear ashes and cement, and also of clear cinders and cement, as well as these materials combined with lime or adhesive substances; but so far as my knowledge extends no one but myself has yet used the compound formed of ashes and cinders with cement."

Dr. Conwell, on page 424 of the record, reads into this clear statement of the prior art the use of sand as a fine aggregate, with either the ashes and cement or the cinders and cement. The prior art patents here shown do not disclose the use of sand as a fine aggregate. The patent does not disclose

it. It would be useful for the complainants here, if those words were read into the prior patents. It would be equally useful for most people in difficulties, if their language could be changed to meet each new situation. In the early days of the English law, conveyancers would not punctuate deeds or instruments of title, because it was thought intolerable that property rights should depend upon anything so little as a comma. How foolish it is for a patent novelty to turn upon prior practice, if words can be read in where wanted.

In the Lorenz patent, No. 509,924, of December 5, 1893, the patentee, in making artificial stone, adds burnt sand to his cinders and ashes.

In the Ransome patent, No. 516,112, of March 6, 1894, building blocks are made. The patentee claims a patent for the following process:

"The process of making artificial blocks or stones from city refuse, consisting in dividing it into two portions, to one of which limestone is added, burning both portions separately, and subsequently grinding the limed portion to fine powder and crushing the other portion into coarse grains, then mixing the two portions together with the necessary quantity of water and molding the mixture into the required shapes."

The Krolman patent No. 713,994, of November 18, 1902, is for a fireproof floor. The patentee places a concrete, between I-beams, composed of one part cement and eight to ten parts of cinders.

The Brunson patent, No. 770,557, dated September 20, 1904, is for an artificial stone consisting of cinders, sand, barytes, cement, lime, and water.

The Marsden patent, No. 828, 041, of August 7, 1906, is for a building block. The patentee uses ground coal, clinkers, and ashes, and a binder of cement and calcined gypsum. The material can be cut and sawed and worked as timber can be.

The Bitterman patent, No. 1,034,680, of August 6, 1912, uses coke breeze and cement to form building blocks. The patentee says that nails can be driven in.

The Atterbury patent, No. 1,163,060, of December 7, 1915, is for artificial stone, made of cinders, cement, and asbestos fiber. Nails, tacks, and screws may be driven therein. The blocks have a cellular texture. The cinders are crushed and screened.

The British patents offered completely anticipate the use of cinders and cement with sand.

The Engineering News of May 4, 1905, at page 471, says that in concrete work, where fiber resistance is an important element, the use of clinkers from steam boiler furnaces for the aggregate is generally considered the best practice. The issue of August 31, 1905, at page 232, says that cinders can be used as an aggregate with concrete, but they must be washed free of foreign particles. Straub says that he cannot use cinders which contain foreign particles (case, p. 83).

In the Cement and Engineering News of September, 1905, at page 171, it says that in Liverpool a new material is being used for building houses, and states: "The material used consists of concrete blocks formed from waste crushed clinker obtained from the city refuse destructor plant."

The Architect's and Builder's Pocket-Book, published 1905, prepared by Frank E. Kidder, speaks of a concrete mixture made of cement and fine cinders and a mixture made of cement and coarse cinders. The cinder concretes, especially the coarse mixture, gave most excellent results. He says: "The highest degree of coherence in the concretes, particularly in the center of the mass tested, was shown by a mixture of one part cement to seven parts of coarse cinders."

In the Proceedings of the Second Convention of the National Association of Cement Users, held at Milwaukee January 9 to 12, 1906, at page 70, appears the following:

"Cinders are sometimes used for block work; they vary greatly in quality, but if clean and of medium coarseness will give fair results. Cinder concrete never develops great strength, owing to the porous character and crushability of the cinders themselves. Cinder blocks may, however, be strong enough for many purposes, and suitable for work in which great strength is not required."

The Engineering Record, vol. 63, of 1911, speaks of the use of clinker concrete in the manufacture of molded and hollow building blocks. The proportions used have generally been one part Portland cement to six parts crushed clinker.

In an article appearing in the Concrete-Cement Age of March, 1913, at page 153, the construction of a group of 40 houses built for the Delaware, Lackawanna & Western Railroad Company in Nanticoke, Pa., is described. These houses were built of steam cinder concrete. The article states that "no sand is used, and the proportion is one part of cement to seven parts cinders." Hydrated lime was added to the mixture.

In addition to the prior patents, and the references in the trade journals and books to the use of cinder concrete blocks, the testimony upon prior public use is convincing.

Harry W. Bell took the cinders from the plant of the New York Edison plant, and also from the big Brooklyn sugar refineries, as early as 1912, and made ,cinder blocks. Documentary proof shows that these Bell blocks were tested by one Harold Perrine, connected with the New York building department, and that the mix used in making the blocks consisted of 3 barrels of coarse cinders, 2½ barrels of fine cinders, and 3 bags of Portland cement. Even if Bell first separated the coarse from the fine cinders, and then recombined them, he is not doing anything so very different from what Straub is doing under his patent. Straub, of course, claims to take the run of the grate. He testified, however, that some cinders make good blocks, and some cinders make poor blocks (case, p. 85). It takes some big pieces and some little pieces to make a good block (case, p. 89). The mere separation and recombination of the cinders makes no very great distinction. Bell said that the man who mixed concrete for the Perrine tested blocks used his own judgment as to the proper proportion of large and fine cinders. Obviously, Straub does the same thing, because he says it takes some big pieces and some little pieces to make a good block, and he is not able to tell how many big and how many little pieces make up a good block. Bell does use proportion. The fact that Straub is unable to state the proportion certainly does not invalidate Bell's prior use. The early Bell blocks were not used for a weight-sustaining wall. They were used for partitions and for filling around boilers. Since it was a cinder and cement block, I do not see that the weight-sustaining quality has anything to do with the matter. The Bell block was not a large block, but I do not understand that Straub can claim a monopoly on the size of his block. The Bell block had the nailable feature for which so much was contended in the Campbell case. The sale slips and other documentary proof indicate that the Bell block was marketed.

David Nyce, of Doylestown, testified that as far back as 1905 he used ,cement, with locomotive cinders obtained from the Reading Railroad, in building a poured concrete factory and in manufacturing cinder blocks. In the poured concrete, sand was used, as well as cinders. Of course, there is nothing to establish this prior use, except Nyce's tes-

timony. He was threatened with infringement suit, and after he had stated what he had done no action was taken against him, although his place of business is in the state of Pennsylvania. If the testimony were untrue, there would have been no difficulty in bringing witnesses to prove Nyce a perjurer, and, had Straub's counsel any confidence in Nyce's alleged perjury, certainly they could have pressed their infringement suit against him and collected royalties.

Henry W. Walker, of Gloucester, made cinder and cement blocks in 1905, and has been making them ever since. He showed a contract, made in 1909, for building a house for a man named Letzgus, in which some mention was made of cinder concrete. Possibly the Walker prior public use does not conform with the requisite degree of proof.

There are other references in the prior art literature and other patents too numerous to mention. It is obvious from the foregoing that a building block was not new; that a building block made of cinders and cement was probably not new; but, even if it were new, the defendants in two of the cases before me used sand with their cinders. Certainly they do not encroach upon Straub by so doing. Since the prior art knew the use of cinders, sand, and cement, those who now use sand cannot be said to infringe, even though Straub has a monopoly on an all cinder cement block made without separating the cinders.

The defendant Melmod does not use sand, but he does use lime and calcium chloride. The prior patents show the use of lime with cement and cinders, just as much as they show the use of sand with cinders and cement.

It seems to me the patent is invalid. Had the record before me been before the Circuit Court of Appeals in the prior case, I have no doubt their conclusion would have been different. However, if Straub has anything, it is limited, in view of the crowded state of the art, to the precise disclosure of the patent.

The bills will be dismissed.